**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 19 2003**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES CELLULAR
TELEPHONE OF GREATER TULSA,
L.L.C., an Oklahoma Limited Liability
Company,

        Plaintiff - Appellant,

v.

CITY OF BROKEN ARROW,
OKLAHOMA,

        Defendant - Appellee.

No. 02-5128

---

UNITED STATES CELLULAR
TELEPHONE OF GREATER TULSA,
L.L.C., an Oklahoma Limited Liability
Company,

        Plaintiff - Appellee,

v.

CITY OF BROKEN ARROW,
OKLAHOMA,

        Defendant - Appellant.

No. 02-5172

---

**APPEALS FROM THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**
**(D. Ct. Nos. 01-CV-0550EA(J) and 01-CV-0518E(M))**

John E. Brightmire, Doerner, Saunders, Daniel & Anderson, L.L.P., Tulsa, Oklahoma, appearing for Plaintiff United States Cellular Telephone of Greater Tulsa, L.L.C.

Elizabeth Anne Wilkening, Deputy City Attorney, Broken Arrow, Oklahoma, appearing for Defendant City of Broken Arrow.

Before **TACHA**, Chief Judge, **BRISCOE**, Circuit Judge, and **SHADUR**,[*] District Judge.

**TACHA**, Chief Circuit Judge.

United States Cellular Telephone of Greater Tulsa, L.L.C. ("U.S. Cellular") brought two separate suits in federal court, challenging decisions by the City of Broken Arrow, Oklahoma ("the City"), denying specific use permit ("SP") requests for the construction of cellular transmission towers. On October 2, 2002, the district court reversed the City's denial of SP-149, concluding that the City's denial violated the Telecommunications Act because it was not supported by "substantial evidence." *United States Cellular Telephone of Greater Tulsa, L.L.C. v. The City of Broken Arrow, Oklahoma*, No. 01-CV-0518-E(M) (N.D. Okla. Oct. 2, 2002) (order granting plaintiff's motion for summary judgment) ("*U.S. Cellular I*"). On July 18, 2002, the district court upheld the City Council's

---

[*] Honorable Milton I. Shadur, Senior District Judge for the Northern District of Illinois, sitting by designation.

denial of SP-150, concluding that "substantial evidence" supported the City's denial. *United States Cellular Telephone of Greater Tulsa, L.L.C. v. The City of Broken Arrow, Oklahoma*, No. 01-CV-0550-EA(J) (N.D. Okla. July 18, 2002) (order granting defendant's motion for summary judgment) ("*U.S. Cellular II*"). For the reasons set forth below, we reverse the district court's judgment in *U.S. Cellular I* and affirm the judgment in *U.S. Cellular II*.

## I. Background

### A. Overview of Broken Arrow's Permit Application Process

In Broken Arrow, Oklahoma, the City's power to grant permits for the construction of cellular transmission towers is defined generally by the Broken Arrow Zoning Ordinance. Article VIII, section 18 of the Zoning Ordinance sets forth specific requirements. Under Article VIII, section 18.6, "[n]o person or entity shall hereafter construct, own, or operate any communication tower in excess of fifty (50) feet in height above the mean elevation of the ground of the lot or parcel on which it is built, unless said person has obtained a permit to construct from the City of Broken Arrow." With limited exceptions not applicable here,[1] the ultimate authority to issue specific use permits, including permits for the construction of "telecommunications towers," resides in the City

---

[1] Under the Zoning Ordinance, the Planning Commission may "administratively" approve certain specific use permits. *See id.*, art. VIII, §§ 18.3, 18.10.

Council.  *See generally* Broken Arrow Zoning Ord., art. VIII, § 18.

In general, the permitting process proceeds as follows.  Once the Broken Arrow Planning Commission (the "Planning Commission") receives a permit application, a Planning Commission staff member, usually the Planning Director, prepares an "Agenda Packet," which sets forth the background of the permit request, the extent of the applicant's conformance with the Zoning Ordinance and other applicable law, and the staff member's recommended course of action.  The preparer of the Agenda Packet submits this report to all members of the Planning Commission.  After notice and public hearing, the Planning Commission forwards its recommendation to the City Council for further consideration and public comment.  The City Council then holds a final hearing and decides whether to accept or reject the Planning Commission's recommendation.[2]  If the City Council decides to deny an application, that decision "shall be conveyed to the applicant in writing, together with the summary of the evidence which supports a denial of the application."  *Id.*, art. VIII, § 18.16.

B.     Requirements Under the Zoning Ordinance

As part of the permitting process, an applicant must provide the City Council with certain required information, set forth in sections 18.7 and

_____

[2] The City Council reviews the Planning Commission's denial of an application only if the applicant files a written request within 15 days.

18.11(A)-(F) of the Zoning Ordinance. With respect to the determination of whether to issue a specific use permit, section 18.12 provides:

The City Council shall consider the following factors . . .

(a) height of the proposed tower;
(b) proximity of the tower to residential structures and adjacent residential lot boundaries;
(c) nature of uses on adjacent and nearby properties;
(d) surrounding topography;
(e) surrounding tree coverage and foliage;
(f) design of the tower, with particular reference to those design characteristics which have the effect of reducing or eliminating visual obtrusiveness;
(g) proposed routes of ingress and egress;
(h) whether or not the tower is constructed so as to be available for co-location in the future; and
(i) whether or not there are suitable, existing towers or other supporting structures capable of meeting the technological needs of the applicant.

*Id.*, art. VIII, § 18.12. Section 18.12 also states that "the City Council may modify one or more of these criteria if, in the particular circumstances of the application, [the] Council concludes that the goals and intent of [the Zoning Ordinance] are better served by such modification." *Id.* Section 18.13 further provides that "[n]o new tower should be permitted by the City Council, unless the applicant demonstrates to the City Council's reasonable satisfaction that no existing tower or other structure can accommodate the

applicant's proposed antenna."[3]  *Id.*, § 18.13.  Finally, the Zoning Ordinance sets forth the City's general policy regarding tower construction in certain zoning districts, under which "towers are normally discouraged in A-1 and RE [agricultural and residential] zoning districts, and applicants shall be required to establish the elements of the application by clear and convincing evidence."  *Id.*, art. VIII, § 18.11(G).

C.      U.S. Cellular's Permit Applications

On February 21, 2001, U.S. Cellular filed two applications for specific use permits with the Planning Commission, seeking to construct the following:  (1) a 120-foot "monopole" cellular transmission tower on a tract of land located at 10525 South 193rd East Avenue in Broken Arrow, Oklahoma (the "East Avenue property") ("SP-149"); and (2) a 240-foot, self-supporting cellular transmission tower on a ten-acre tract of land owned by the Forest Ridge Baptist Church, located at 8300 South Oneta Road in Broken Arrow, Oklahoma (the "South Oneta Road property") ("SP-150").

In addition to SP-149 and SP-150, U.S. Cellular had filed numerous other permit applications with the City to construct cellular towers.  For

---

[3] Section 18.13 then lists five factors the City Council may consider in determining the unavailability of alternate sites.

example, on June 18, 2001, the City Council approved U.S. Cellular's application to construct a 100-foot monopole tower on the west side of Queens Circle. In fact, according to Doyle Groat, a U.S. Cellular engineer, as of July 16, 2001, U.S. Cellular had completed eight projects within the City. At least three of these projects involved new tower construction; the remaining five apparently involved co-location.

1.    *SP-149*

In its first application, SP-149, U.S. Cellular proposed to construct a 120-foot monopole tower on the East Avenue property, a six-acre tract the City annexed on September 18, 2000. The City assigned the East Avenue property the zoning classification "AR-1," a transitional-zoning category denoting single-family residential use; at the time of U.S. Cellular's application, however, there were no residences on the property.[4] The land surrounding the East Avenue property was zoned as follows: to the north, AR-1, single-family residential; to the south, A-1, agricultural with one single-family residence; to the east, AR-1, single-family residential; and to the west, AG, agricultural.

As part of their application, U.S. Cellular submitted two maps

---

[4] In fact, the closest residence to the proposed tower site was located 300 feet to the south, on land zoned for agricultural use.

prepared by radio frequency engineers. The first map showed U.S. Cellular's existing coverage within the City. The second illustrated the additional coverage U.S. Cellular would be able to provide following the completion of the proposed SP-149 tower. U.S. Cellular also attached the affidavit of Keith Sach, an Associate Radio Frequency Engineer with U.S. Cellular. In his affidavit, Mr. Sach stated, *inter alia*, that "[t]here are no existing towers or permits for towers located within [one-half] mile of the [SP-149] site." Sach Affid. ¶ 3. Finally, U.S. Cellular's application also stated that "[n]o existing tower can accommodate the proposed antenna." In support of this statement, U.S. Cellular referred to the attached coverage maps and Mr. Sach's affidavit.

2. *SP-150*

In its SP-150 application, U.S. Cellular proposed to construct a 240-foot tower on the South Oneta Road property, a ten-acre tract of land in the southeast part of the City owned by the Forest Ridge Baptist Church. At the time of U.S. Cellular's application, the South Oneta Road property was zoned "AA-1," a transitional-zoning category indicating agricultural use. Although on February 19, 2001, the City Council approved a change in zoning for the South Oneta Road property, pursuant to which the property would be zoned "A-1," a conventional-zoning category indicating

agricultural use, the City Council had conditioned its approval on the site being platted. At the time of the events in question, the Forest Ridge Baptist Church had not yet platted the South Oneta Road property.[5] The land bordering the South Oneta Road property was zoned as follows: to the north and west, R-1, single-family residential; to the east, undeveloped with one single-family residence; and to the south, A-1, agricultural, with one single-family residence.

### D.     The City's Denials

#### 1.     *SP-149*

##### a.     *The Agenda Packet*

Prior to the Planning Commission's April 26, 2001, meeting, Farhad Daroga, the City's Planning Director, prepared an Agenda Packet setting forth the background information concerning SP-149. In particular, Planning Director Daroga discussed the degree to which SP-149 conformed with the Zoning Ordinance. In his report, Planning Director Daroga made

---

[5] Apparently, on May 7, 2001, the City Council had reached an agreement with the Forest Ridge Baptist Church, owners of the South Oneta Road property, "to defer platting until the next expansion project is considered." At the June 18, 2001, City Council meeting, the Church and some City Council members disagreed as to whether SP-150 constituted an "expansion project," which would revoke the Church's platting deferral. In his June 18, 2001, report on SP-149, the City Manger noted that "[p]latting or waiving . . . the platting requirement is the prerogative of the City Council."

-9-

the following observations: (1) SP-149 did not conform to the Zoning Ordinance's setback requirements; (2) SP-149's proposed site was zoned AR-1, a transitional-zoning category, and under applicable law no new use could commence on the tract until appropriate conventional zoning was obtained and the site had been platted;[6] (3) an alternative suitable site existed for U.S. Cellular's proposed 120-foot monopole tower, located one-half mile from SP-149's proposed site on the east side of County Line Road; and (4) SP-149 did not include a landscape plan, as required under the Zoning Ordinance. Based on these findings, Planning Director Daroga recommended that the Planning Commission deny SP-149. All members of the Planning Commission received a copy of the Agenda Packet.

>    b.    *The Planning Commission Recommends that the City Council Deny SP-149.*

On April 26, 2001,[7] the Planning Commission considered SP-149. At the beginning of the hearing, Planning Director Daroga addressed the Planning Commission and discussed the findings contained in the Agenda Packet he had prepared. Planning Director Daroga recommended denying

---

[6] The Agenda Packet noted that the Planning Commission had denied SP-144 for the same reason.

[7] The hearings for both SP-149 and SP-150 were originally scheduled for March 22, 2001, but the City Council tabled both hearings at the request of U.S. Cellular.

SP-149, stating that "the application does not meet the minimum setback requirements, which is 120 percent, and the property is zoned R-1, the zoning code calls for discouraging cell towers in residential-zoned districts."[8] Later in the hearing, Planning Director Daroga noted that there were several alternative sites within one-half mile of the proposed site and an existing tower just over one-half mile away suitable for co-location. He presented no evidence relating to the adequacy of these sites.

Following Planning Director Daroga's opening remarks, Kevin Coutant, an attorney for U.S. Cellular, addressed the Planning Commission. Mr. Coutant stated that SP-149's "primary objective" was to enable U.S. Cellular to provide coverage on the Creek Turnpike, in anticipation of increased demand. During his presentation, Mr. Coutant attempted to address several of the concerns raised in the Agenda Packet and in Commission members' comments, including questions relating to: (1) the Zoning Ordinance's setback requirements; (2) alternative sites; (3) the Zoning Ordinance's prohibition against new uses in transitional-zoning areas; and (4) the City's general policy disfavoring the construction of cellular towers within single-family residential areas.

---

[8] Planning Director Daroga had not raised this second concern in the Agenda Packet.

Concerning the setback issue, Mr. Coutant argued that, under a fair reading of section 18.14, SP-149 complied with the Zoning Ordinance's setback requirement because the property along the south border of the East Avenue property was zoned for agricultural use rather than residential use.[9]

With respect to the prohibition against new uses on transitionally-zoned property, Mr. Coutant requested that the Planning Commission approve SP-149 "subject to subsequent rezoning." Mr. Coutant suggested that it made little economic sense for U.S. Cellular to incur the costs associated with obtaining the zoning change before the City approved SP-149.

Finally, Mr. Coutant asked Doyle Groat and Keith Sachs, two U.S. Cellular engineers, to respond to the concerns regarding alternative sites. In addition to Mr. Groat's general comments, Mr. Coutant referred the Commission to the coverage map, which U.S. Cellular had attached to its

---

[9] Planning Director Daroga based his opinion to the contrary on the fact that, even though it was zoned for agricultural use, there was a single-family residence on the property.

During the hearing, however, Planning Commission members expressed a different concern. Some members inquired about the limitations approval of SP-149 might place on the City's ability to later rezone the property south of the proposed site for single-family residential use, in light of section 18.14's setback requirement. In other words, the members' concern was that, by approving SP-149, it would create a zone of land (with a radius equal to 120 percent of the tower's height) that could not be developed for single-family residential use.

-12-

SP-149 application. Mr. Coutant explained that, in addition to providing coverage on the turnpike, which he had previously characterized as SP-149's "primary objective," U.S. Cellular's decision to locate SP-149 on the East Avenue property was based on the fact that this location would enable it to achieve a "multiplicity of objectives," including "in-building penetration" at Northeastern State University's Broken Arrow ("NSU-BA") campus.[10] When Planning Director Daroga inquired whether U.S. Cellular had considered co-locating on the existing tower close to the NSU-BA campus, Mr. Sach responded: "Yes – well, yes, we've considered that. . . . [I]t won't give us the type of service coverage we're – we're wanting not only for the [NSU-BA] campus but also for in-vehicle coverage along the turnpike section we'll be going in." U.S. Cellular offered no evidence to substantiate Mr. Sach's statement.

At the conclusion of the hearing, the Planning Commission unanimously voted to deny SP-149. The City Manager, Michael D. Kadlecik, then forwarded the Planning Commission's recommendation to the Mayor and the City Council in a report dated June 18, 2001.[11]

---

[10] In his remarks during the Planning Commission's later hearing on SP-150, Mr. Coutant stated: "The objective here is just a little bit different than – than what we discussed at the [SP-149] site. This is truly a coverage site."

[11] This report was nearly identical to the Planning Commission's April 26,

(continued...)

c.      *The City Council Adopts the Planning*

*Commission's Recommendation to Deny SP-149.*

On June 18, 2001, the City Council held its hearing on SP-149.

During the hearing, City Council members expressed three primary

concerns:  (1) SP-149's noncompliance with the Zoning Ordinance's

setback requirements; (2) SP-149's impediment to residential development

on and around the East Avenue property, in light of the Zoning Ordinance's

setback requirements; and (3) the existence of alternative locations.

At the hearing, Mr. Coutant again appeared on behalf of U.S.

Cellular.  In addressing the City Council, Mr. Coutant discussed the

concerns voiced at the earlier hearing before the Planning Commission.  On

the setback question, U.S. Cellular agreed to relocate the position of the

tower on the proposed site, in order to conform with the Planning

Commission's interpretation of section 18.14's setback requirement.[12]

Mr. Coutant also responded to the Planning Commission's concerns

about impeding residential development on the East Avenue property and

---

[11](...continued)
2001, Agenda Packet.

[12] Mr. Coutant abandoned his earlier position, in which he had disagreed
with the City Council's interpretation of the Zoning Ordinance's setback
requirements, specifically, the meaning of "adjacent residential lot boundaries."
*See* Broken Arrow Zoning Ord., art. VIII, § 18.14.

-14-

the surrounding land. Initially, Mr. Coutant noted that "our landlord, the owner of the property, is comfortable with the consequences of the impact of [the] tower on the entirety of that radius . . . and his analysis suggest that this – this is a good utilization of his property." Mr. Coutant also disagreed with the Planning Commission's interpretation of section 18.14's setback requirement. Under Mr. Coutant's interpretation, the Zoning Ordinance did not prohibit *residential* construction within a 120-percent radius of a telecommunications tower; rather, it prohibited only *tower* construction within a 120-percent radius of residential construction. In other words, according to Mr. Coutant, section 18.14 placed "a burden on [telecommunications providers] . . . [but did] not prevent residential development around the tower."

Mr. Coutant next addressed the Zoning Ordinance's prohibition against new uses for transitionally-zoned property and again requested that the City Council conditionally approve SP-149, subject to U.S. Cellular securing the necessary conventional zoning and completing the platting. Specifically, Mr. Coutant stated, "we understand and nod to the fact that your code does contemplate rezoning, but would ask for approval subject to that condition."

Finally, with respect to the availability of alternative sites, Mr.

Coutant again referred the City Council to the coverage maps attached to U.S. Cellular's SP-149 application while attempting to address City Council member's specific concerns.

Following this hearing, the City Council adopted the Planning Commission's recommendation and denied SP-149. On July 17, 2001, Planning Director Daroga, on behalf of the City, sent written notification of the City Council's decision to U.S. Cellular, as required under article VIII, section 18.16 of the Zoning Ordinance. The letter set forth the following four reasons[13] supporting the City Council's denial: (1) U.S. Cellular's proposed tower did not meet the Zoning Ordinance's setback requirements; (2) U.S. Cellular's proposed site was zoned AR-1, a transitional-zoning category, and under applicable law no new use may commence on land until appropriate conventional zoning is obtained; (3) U.S. Cellular's proposed site was zoned AR-1, a designation similar to the R-1 single-family residential designation, and applicable law prohibited telecommunications towers with heights in excess of 50 feet on any property actually used for a single-family residential purpose; and (4) other suitable sites existed for

_____

[13] The letter stated that "*[a]s discussed during the City Council and Planning Commission hearings*, this application was denied for several reasons, including, but not limited to the [reasons set forth in the letter]." (emphasis added).

U.S. Cellular's proposed telecommunications tower, specifically, an existing tower one-half mile north of U.S. Cellular's proposed site. Planning Director Daroga enclosed the following supporting materials with the letter: (1) the Planning Commission's Agenda Packets, dated March 22, 2001, and April 26, 2001; (2) the City Manager's report to the City Council, dated June 18, 2001; (3) the minutes of the Planning Commission's hearings on March 22, 2001, and April 26, 2001; and (4) the minutes of the City Council's hearing on June 18, 2001. The letter concluded with the following: "If you wish to pursue a site for a telecommunications tower in the vicinity discussed, we would be glad to work with you and your clients and suggest additional sites within this area."

        2.     *SP-150*

        a.     <u>*The Agenda Packet*</u>

Planning Director Daroga also prepared the Agenda Packet for SP-150. In his report, Planning Director Daroga recommended denying SP-150 for the following reasons: (1) SP-150's proposed site was zoned AA-1, a transitional-zoning category, and under applicable law no new use may commence on land prior to the applicant obtaining appropriate conventional

-17-

zoning and the completion of platting and site-plan review;[14] (2) the City Council had approved SP-150's proposed site for A-1 zoning, towers are normally discouraged in A-1 zoning districts, and U.S. Cellular had not presented "clear and convincing evidence" supporting its application, as required under the Zoning Ordinance; (3) at least two alternative suitable sites existed for U.S. Cellular's proposed 240-foot tower, one located one-half mile south of the South Oneta Road property and another located one and one-half miles southwest; and (4) SP-150 did not include a landscape plan, as required under the Zoning Ordinance. The report also noted that the Cambridge Estates subdivision bordered SP-150's proposed site to the north and west and stated that "[a] 240-foot high tower adjacent to single-family homes is not a desirable land use." All members of the Planning Commission received a copy of the Agenda Packet prior to the hearing on SP-150.

b. *The Planning Commission Recommends that the City Council Deny SP-150.*

On April 26, 2001, the Planning Commission held its hearing on SP-

---

[14] The report indicated that the Planning Commission had received a site plan for the South Oneta Road property, but also noted that "the property has not been platted and all applicable zoning requirements have not been completed." Based on these facts, Planning Director Daroga described SP-150 as "premature."

150. Planning Director Daroga presented a brief overview of SP-150 and gave his recommendation to the Planning Commission. Mr. Coutant again appeared on behalf of U.S. Cellular.

Mr. Coutant first addressed the two alternative locations noted in the Agenda Packet. According to Mr. Coutant, neither site "would . . . give nearly the coverage that would support the location of a new facility" or "give the best benefit to the most citizens of the community." Mr. Coutant offered no evidence in support of this conclusion. Nor did the supporting materials for U.S. Cellular's SP-150 application address the technological or financial feasibility of either of the alternatives mentioned in the Agenda Packet.

Next, Mr. Coutant stated that the "transitional" zoning issue raised in the Agenda Packet was moot under his reading of the Zoning Ordinance, since the City Council had approved the South Oneta Road property for "conventional" zoning. Mr. Coutant went on to state, however, that regardless, "[U.S. Cellular] would certainly entertain and – and be pleased to have an approval that had conditions that – that zoning had to be changed."[15]

---

[15] Mr. Coutant made a similar offer regarding the platting for the South Oneta Road property.

With respect to the Zoning Ordinance's policy statement disfavoring tower construction in A-1 areas, Mr. Coutant conceded, "[n]o, that is exactly what your code says, and no, I – I can't disagree with that."  Mr. Coutant also stated:

> I would just suggest that because of the matters that have been presented and – and the need for service and the fact that this in one tower takes care of quite a broad area for the foreseeable future without imposing, in this sense, needless construction of multiple towers to provide the same range of service is – is a application that overcomes the [clear and convincing evidence] burden that you suggest.

Following Mr. Coutant's statements, six Broken Arrow residents spoke in opposition of SP-150, voicing concerns related to the tower's aesthetic impact.[16]  In addition, at least two residents wrote letters to the Planning Commission strenuously objecting to SP-150.  One resident spoke in favor of SP-150.

At the conclusion of the hearing, Planning Director Daroga stated:

> Staff recommends that SP-150 be denied due to improper zoning and the zoning ordinance discouraging towers in the A-1 district.  A 180-foot tower[17] adjacent to a single-family residential neighborhood and their recreational area which comprises of the recreational amenities back there is an

---

[16] Although the Planning Commission's meeting minutes indicate that 12 to 14 protesters were at the meeting, the transcript of the hearing indicates that only six actually spoke out in opposition.

[17] Before the Planning Commission, Mr. Coutant amended SP-150's proposed height from 240 to 180 feet.

-20-

inappropriate use – land use in a – this site. This site is surrounded on three sides – or four by residential usage.

The Planning Commission then voted unanimously to recommend that the City Council deny SP-150. The City Manager forwarded the Planning Commission's recommendation to the Mayor and the City Council, in a report dated June 18, 2001.[18]

           c.      *The City Council Adopts the Planning Commission's Recommendation to Deny SP-150.*

On June 18, 2001, the City Council held its hearing on SP-150. During the hearing, Council members posed various questions to Mr. Coutant, who again appeared on behalf of U.S. Cellular.

Vice-Mayor Tony Petrik asked Mr. Coutant whether U.S. Cellular had prepared maps indicating the coverage a 100-foot tower would provide. Vice-Mayor Petrik presented other City Council members with photographs of a 100-foot "camouflaged" tower on church grounds in Sapulpa, Oklahoma.[19] Mr. Coutant indicated that U.S. Cellular had not prepared any such maps. In fact, Mr. Coutant stated that U.S. Cellular would not

---

[18] The City Manager's report was nearly identical to the Planning Commission's April 26, 2001, Agenda Packet.

[19] The Forest Ridge Baptist Church's pastor, Reverend Gray, reacted positively to Vice-Mayor Petrik's suggestion, noting that "if we could satisfy U.S. Cellular and satisfy – it would certainly satisfy the church."

-21-

consider a 100-foot tower.[20]

Several protesters appeared at the June 18, 2001, hearing. One citizen, Shelly Schaede, presented a petition disapproving of SP-150 signed by "about 70" residents of the neighborhood bordering the South Oneta Road property.

As the hearing proceeded, City Council members expressed increased interest in the possibility of a 100-foot camouflaged tower. Councilman Wade McCaleb suggested postponing the Council's vote on SP-150, so that U.S. Cellular could consider such a modification and provide the City with a coverage map for a 100-foot tower.

Mr. Coutant initially dismissed the suggestion, stating: "Gentlemen, excuse me. I . . . appreciate the – the spirit of compromise that – that is suggested by the motion. I mean, we . . . brought it down to 180 feet because that's . . . the lowest that – that accommodates the need." Later in the hearing, however, Mr. Coutant indicated that U.S. Cellular would consider a 100-foot camouflage tower. The City Council then concluded the meeting and agreed to hold another hearing on July 16, 2001.

On July 16, 2001, the City Council held its second hearing on SP-

---

[20] Specifically, Mr. Coutant stated: "We would not build a 100-foot tower. It – it – it would serve no purpose."

150.  At the outset, Planning Director Daroga noted that U.S. Cellular had submitted no additional information in response to the Council's June 18, 2001, request for additional information on the possibility of a 100-foot camouflaged tower.

Ms. Kelly Knopp Balman appeared on behalf of U.S. Cellular. Initially, Ms. Balman addressed the City Council's earlier suggestion of a 100-foot camouflaged tower.  Ms. Balman stated:  "U.S. Cellular has discussed a 100-foot tower with their engineers and with the business personnel with respect to the economic aspects as well as the engineering needs of the cell network, and we have determined that the 100-foot . . . tower will not meet our needs."  Ms. Balman submitted no evidence in support of this conclusion.

Mr. Groat, a U.S. Cellular engineer, also appeared on behalf of U.S. Cellular, to discuss the technical aspects of SP-150.  Although Mr. Groat provided some explanation of U.S. Cellular's "siting" process, he offered no reports or other evidence to support U.S. Cellular's proposed site.  Thus, U.S. Cellular's initial application packet and its attached coverage maps were the sole materials U.S. Cellular submitted to the City Council in support of its application.

At the conclusion of the July 16, 2001, hearing, the City Council

voted unanimously to deny SP-150. On July 20, 2001, Planning Director Daroga sent a letter to U.S. Cellular on behalf of the City, confirming the City Council's denial, citing the following reasons: (1) U.S. Cellular's proposed site was zoned AA-1, a transitional-zoning category, and under applicable law no new use may commence on land until appropriate conventional zoning is obtained; (2) U.S. Cellular's proposed site was conditionally approved for A-1 zoning, and applicable law discourages tower construction in such areas and requires clear and convincing evidence of the applicant's need to construct within such area; (3) other suitable sites existed for U.S. Cellular's proposed telecommunications tower, including towers available for co-location; and (4) U.S. Cellular provided no materials in response to the City Council's request that U.S. Cellular consider a 100-foot camouflaged tower for the site, despite the fact that the City Council provided U.S. Cellular a month to do so.

The letter indicated that the City Council reached its conclusion based on "[U.S. Cellular's] submittals, the Planning Commission recommendation, findings by the City Council, and the fact that all possible alternatives and the Zoning Ordinance were not followed." Planning Director Daroga enclosed the following supporting materials with the letter: (1) the Planning Commission's Agenda Packet, dated April 26, 2001; (2)

the City Manager's reports to the City Council, dated June 18, 2001, and July 16, 2001; (3) the minutes of the Planning Commission's hearing on April 26, 2001; and (4) the minutes of the City Council's June 18, 2001, hearing. The letter concluded with the following: "If you wish to pursue a site for a telecommunications tower in the vicinity discussed, we would be glad to work with you and your clients and suggest additional sites within this area."

## II. Discussion

### A. Overview of Applicable Law

Except for the narrow limitations set forth in 47 U.S.C. § 332(c)(7)(B), "[t]he Telecommunications Act expressly preserves local zoning authority over the placement, construction and modification of personal wireless service facilities." *Cellular Telephone Co. v. Zoning Bd. of Adjustment of the Borough of Ho-Ho-Kus*, 197 F.3d 64, 68 (3d Cir. 1999).

Section 332(c)(7)(B) places six restrictions on the authority of state and local governments to regulate the placement, construction, and modification of personal wireless service facilities. Three of these restrictions are procedural. First, "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct,

or modify personal wireless service facilities shall be in writing." 47 U.S.C. § 332(c)(7)(B)(iii). Second, such denials must be "supported by substantial evidence contained in a written record." *Id.* Third, local authorities must "act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request." *Id.* § 332(c)(7)(B)(ii).

The remaining three requirements limiting state and local authority over the placement, construction, and modification of personal wireless service facilities are substantive. First, local authorities " shall not unreasonably discriminate among providers of functionally equivalent services." *Id.* § 332(c)(7)(B)(i)(I). Second, local governments "shall not prohibit or have the effect of prohibiting the provision of personal wireless services." *Id.* § 332(c)(7)(B)(i)(II). Finally, Congress provided that "[n]o State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions." *Id.* § 332(c)(7)(B)(iv).

In the cases presently before us, our inquiry pertains only to the second of the procedural limitations on state and local authority: whether the City Council's denials of SP-149 and SP-150 were supported by substantial evidence. For the reasons set forth below, we conclude that they were.

B.    Whether the City's Denials of SP-149 and SP-150 Were
      Supported by "Substantial Evidence."

1.    *The Substantial Evidence Standard*

Under 47 U.S.C. § 332(c)(7)(B)(iii), "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." Section 332(c)(7)(B)(iii)'s substantial-evidence requirement "does not 'affect or encroach upon the substantive standards to be applied under established principles of state and local law.'"    *Cellular Telephone Co. v. Town of Oyster Bay*, 166 F.3d 490, 494 (2d Cir. 1999) (citation omitted). "'Substantial evidence' review under the [Telecommunications Act] does not create a substantive federal limitation upon local land use regulatory power, but is instead 'centrally directed to those rulings that the Board is expected to make under state law and local ordinance in deciding on

variances, special exceptions and the like.'" *Southwestern Bell Mobile Systems, Inc. v. Todd*, 244 F.3d 51, 58 (1st Cir. 2001) (citation omitted). Accordingly, we look to the requirements set forth in the local zoning ordinance to ascertain the substantive criteria to be applied. *See Town of Amherst, N.H. v. Omnipoint Communications Enterprises, Inc.*, 173 F.3d 9, 14 (1st Cir. 1999). In sum, "[t]he reviewing court's task is to determine whether the [local authority's] decision, as guided by local law, is supported by substantial evidence." *Borough of Ho-Ho-Kus*, 197 F.3d at 72.

We begin by noting that judicial review under the substantial-evidence standard is quite narrow. *Ready Mixed Concrete Co. v. N.L.R.B.*, 81 F.3d 1546, 1551 (10th Cir. 1996); *American Trucking Ass'ns, Inc. v. I.C.C.*, 703 F.2d 459, 462 (10th Cir. 1983) ("It is axiomatic that the scope of review by an appellate court of a Commission decision is a narrow one."). That said, "[our] review, though highly deferential, 'is not a rubber stamp.'" *Todd*, 244 F.3d at 58-59 (quoting *Penobscot Air Servs., Ltd. v. Fed. Aviation Admin.*, 164 F.3d 713, 718 (1st Cir. 1999)). "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker]. Substantial evidence requires more than a scintilla but less than a preponderance."

*Sandoval v. Aetna Life & Casualty Ins. Co.*, 967 F.2d 377, 382 (10th Cir. 1992) (internal quotation marks omitted). "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Curtis, Inc. v. I.C.C.*, 662 F.2d 680, 685 (10th Cir. 1981).

2.    *The City's Reasons for Denying SP-149 and SP-150*

Prior to conducting our substantial-evidence review, we must address the parties' dispute with respect to the reasons undergirding the City Council's two denials. Limiting its consideration to the transcripts of the City Council's voice votes, U.S. Cellular argues that the City Council denied SP-149 solely on the basis of two findings: (1) SP-149's failure to comply with the Zoning Ordinance's 120-percent setback requirement; and (2) the availability of alternative sites. Similarly, with respect to SP-150, U.S. Cellular argues that City Council premised its denial on (1) the availability of alternative sites, and (2) the existence of towers suitable for co-location.

The City, on the other hand, argues that we should look to its written denials of SP-149 and SP-150, sent to U.S. Cellular on July 17, 2001, and July 20, 2001, respectively, both of which set forth numerous reasons not contained in the voice-vote portions of the City Council meeting

transcripts.

In advancing its argument, U.S. Cellular notes that City Council members, during the voice votes on SP-149 and SP-150, mentioned only the pairs of reasons noted above. According to U.S. Cellular, these reasons alone constitute the City Council's "true" bases for the denials. We reject this argument for several reasons.

First, all of the reasons set forth in the City's letters of July 17, 2001,[21] and July 20, 2001, were aired during the extensive proceedings the City conducted on SP-149 and SP-150, which included consideration by the Planning Director, the Planning Commission, and the City Council.[22] In

---

[21] One caveat, although it does not change the result in this case. It does not appear that the City had, prior to its July 17, 2001, letter, *specifically* discussed article VIII, section 18.4 of the Zoning Ordinance, which prohibits the construction of telecommunications towers with heights in excess of 50 feet on any property actually used for single-family residential purposes. That said, both the Planning Commission and the City Council discussed at length the fact that the East Avenue property was earmarked for single-family residential use and the impediment SP-149 might place on residential development on the East Avenue property and the surrounding area.

[22] As we discussed earlier, the City set forth four reasons for its denial of SP-149: (1) U.S. Cellular's proposed site was zoned AR-1, a transitional-zoning category, and under applicable law, no new use may commence on land until appropriate conventional zoning is obtained, *see* Broken Arrow Zoning Ord. art. VIII, § 15.5; (2) other suitable sites existed for U.S. Cellular's proposed telecommunications tower, specifically, an existing tower one-half mile north of U.S. Cellular's proposed site, *see id.*, art. VIII, § 18.13; (3) U.S. Cellular's proposed site was earmarked for single-family residential use, and applicable law prohibited telecommunications towers with heights in excess of 50 feet on any

(continued...)

-30-

other words, the City did not create the reasons set forth in its denial letters *post hoc* . In fact, the reasons set forth in the City's letters were the same, or substantially similar to, the reasons set forth in the Agenda Packets, which Planning Director Daroga created at the very beginning of the process, prior to the Planning Commission's initial consideration of SP-149 and SP-150. All City Council members received copies of the respective Agenda Packets prior to the hearings on SP-149 and SP-150. [23] Further, the City noted in its July 20, 2001, letter that its denial was based, in part, on

---

[22](...continued)
property used for a single-family residential purpose, *see id.*, art. VIII, § 18.4; and (4) U.S. Cellular's proposed tower did not meet the Zoning Ordinance's setback requirements, *see id.*, art. VIII, § 18.14.

As for SP-150, we noted earlier that the City Council denied the request for four reasons. First, SP-150's proposed site was zoned AA-1 at the time of U.S. Cellular's application, which is a transitional-zoning category, and under applicable law, no new use may commence on the land until appropriate conventional zoning is obtained. *See id.*, art. VIII, § 15.5. Second, U.S. Cellular's proposed site was conditionally approved for A-1 zoning, and applicable law discouraged tower construction in such areas and required clear and convincing evidence of the applicant's need to construct within such an area. *See id.*, art. VIII, § 18.11(G). Third, other suitable sites were available to U.S. Cellular for its proposed telecommunications tower. *See id.*, art. VIII, § 18.13. Finally, U.S. Cellular provided no materials in response to the City Council's request that U.S. Cellular consider a 100-foot camouflaged tower for the SP-150 site, despite the fact that the City Council provided U.S. Cellular a month to comply with this request.

[23] On June 18, 2001, the City Manager forwarded reports on SP-149 and SP-150, which were substantially similar to the Agenda Packets for the two permit applications.

"the Planning Commission's recommendation," which in turn was based on Planning Director Daroga's findings set forth in the Agenda Packet.

Second, the Zoning Ordinance specifically provides that "[a]ny decision[] to deny an application for the placement, construction, modification of towers for cellular or personal communication service, or specialized radio mobile service shall be conveyed to the applicant in writing." Broken Arrow Zoning Ord. art. VIII, § 18.16. Thus, local law identifies the written decision as the proper source for the reasons supporting the denial, *see Borough of Ho-Ho-Kus*, 197 F.3d at 72, and this court will not assume that the City acted in contravention of section 18.16's self-imposed procedural requirement.

Similarly, given the "writing" requirement contained in the Telecommunications Act, 47 U.S.C. § 332(c)(7)(B)(iii), logic dictates that we look to the required writing to determine the basis for the City Council's decision. As the First Circuit suggested in *Todd*, the purpose of section 332(c)(7)(B)(iii)'s "writing" requirement is to facilitate meaningful judicial review. 244 F.3d at 60 ("[The] written denial must contain a sufficient explanation of the reasons for the permit denial to allow a reviewing court to evaluate the evidence in the record supporting those reasons.").

Third, according to U.S. Cellular, "[i]t would be patently unfair to speculate that the members of the City Council who voted upon the specific motion, as seconded, would agree to that which was not expressly voted upon." We agree. But it would be similarly unfair to assume, as U.S. Cellular invites us to, that each City Council member who voted to deny U.S. Cellular's application necessarily adopted only those reasons stated by the Council member who initiated the motion at the end of lengthy written and oral consideration. Fortunately, the City's denial letters, which set forth in writing the City's reasons for denial, remove the need for such speculation.

Based on the above, we reject U.S. Cellular's argument that we should remove from the scope of our substantial-evidence review the reasons set forth in the City's denial letters of July 17, 2001, and July 20, 2001 and record evidence supporting those reasons.

3. *SP-149*

U.S. Cellular raises two principal points in contending that the City Council's denial of SP-149 cannot withstand substantial-evidence review. First, U.S. Cellular argues that the City Council failed to apply the standards and criteria set forth in the Zoning Ordinance. Second, U.S.

-33-

Cellular contends that the reasons [24] set forth in the City Council's July 17, 2001, letter were not supported by substantial evidence. We consider each contention in turn.

First, the transcripts of the City Council's June 18, 2001, hearing belie U.S. Cellular's assertion that "the City Council did not review the Section 18.12 factors" in denying SP-149. In accordance with section 18.12's mandate, City Council members considered the following: (1) the "proximity of the tower to residential structures and adjacent residential lot boundaries" and the "nature of uses on adjacent and nearby properties," [25] Broken Arrow Zoning Ord. art. VIII, § 18.12(b)-(c); (2) the height and design of the proposed tower, with particular reference to those design characteristics which have the effect of reducing or eliminating visual obtrusiveness, [26] *id.* § 18.12(a), (f); and (3) "whether . . . there are suitable, existing towers or other supporting structures capable of meeting the technological needs of the applicant," [27] *id.* § 18.12(i). Further, both the

---

[24] For a list of the City's four reasons, see note 22, *supra*.

[25] Transcript of June 18, 2001, Broken Arrow City Council Meeting on SP-149, at 14-15, 22, 24-25.

[26] Transcript of June 18, 2001, Broken Arrow City Council Meeting on SP-149, at 16.

[27] Transcript of June 18, 2001, Broken Arrow City Council Meeting on SP-

(continued...)

Planning Director and the Planning Commission considered SP-149 under the factors contained in section 18.12.

Second, we must consider whether substantial evidence supported the reasons set forth in the City Council's July 17, 2001, letter. The City Council based its denial, in part, on the fact that U.S. Cellular's proposed site was zoned AR-1, a transitional-zoning category, and applicable law provided that "[n]o new use may be commenced on land, which is assigned transitional zoning . . . without obtaining appropriate conventional zoning." *Id.*, art. VIII, § 15.5.

With respect to this aspect of the City Council's decision, U.S. Cellular notes that "[it] expressly agreed to pursue the platting and zoning change as a condition to the granting of the special use permit." U.S. Cellular argues that "nothing in the [Zoning Ordinance] prohibit[ed] [the City Council from] granting the special use permit subject to acquiring the proper zoning and platting." We disagree.

Under the plain language of article VIII, section 15.5, "[n]o new use may be commenced on land which is assigned transitional zoning . . . without obtaining appropriate conventional zoning." Although U.S.

[27](...continued)
149, at 8-15, 19, 22, 24.

Cellular argues that section 15.5 only prohibits "use," rather than the grant of a conditional permit, the City Council had, on at least one previous occasion, interpreted section 15.5 in a manner consistent with the construction employed in its denial of SP-149. Further, even if we agreed with U.S. Cellular's construction of section 15.5, we may not overturn the City Council's interpretation of its own Zoning Ordinance. Rather, our task is a limited one; our sole inquiry under 47 U.S.C. § 332(c)(7)(B)(iii) is "whether the [local authority's] decision, *as guided by local law*, is supported by substantial evidence." *Borough of Ho-Ho-Kus*, 197 F.3d at 72 (emphasis added). As to the City Council's decision here, the answer is plainly yes.

U.S. Cellular does not dispute the fact that the East Avenue property was zoned AR-1, a "transitional" zoning category under the Zoning Ordinance; nor does it contend that it had "obtain[ed]" conventional zoning. *See* Broken Arrow Zoning Ord. art. VIII, § 15.5. Thus, SP-149 clearly falls within section 15.5's prohibition. "N othing in the Telecommunications Act forbids local authorities from applying general and nondiscriminatory standards derived from their zoning codes." *Aegerter v. City of Delafield*, 174 F.3d 886, 891 (7th Cir. 1999). Accordingly, we conclude that substantial evidence supported the City

Council's denial based on section 15.5.

In an attempt to avoid this result, U.S. Cellular argues that "[i]t makes no sense to require U.S. Cellular to expend the time and resources to obtain the platting and rezoning of the Subject Property *before* it knows whether it can obtain a special use permit to place the tower on the property." Even if we agreed with U.S. Cellular, this would not alter our conclusion; so long as the municipality's decision is grounded in local law and supported by substantial evidence, 47 U.S.C. § 332(c)(7)(B)(iii) is satisfied. On this point, the Seventh Circuit's observation is instructive:

> Some may disagree with Congress's decision to leave so much authority in the hands of state and local governments to affect the placement of the physical infrastructure of an important part of the nation's evolving telecommunications network. But that is what it did when it passed the Telecommunications Act of 1996, and it is not our job to second-guess that political decision.

*City of Delafield*, 174 F.3d at 892.

The City Council also based its denial on section 18.13, which provides that "[t]he applicant [must] demonstrate[] to the City Council's reasonable satisfaction that no existing tower or other structure can accommodate the applicant's proposed antenna." Broken Arrow Zoning Ord. art. VIII, § 18.13. In the Planning Commission's April 26, 2001, Agenda Packet, a copy of which was provided to U.S. Cellular, Planning Director Daroga noted that there was an alternative site for U.S. Cellular's

-37-

proposed 120-foot monopole, located slightly more than one-half mile from SP-149's proposed site on the east side of County Line Road.

U.S. Cellular offered *no* substantive evidence concerning the feasibility of co-locating on the County Line Road tower.[28] The only evidence in the record concerning the feasibility of this site consists of the following: (1) statements before the Planning Commission from Doyle Groat, a U.S. Cellular engineer;[29] and (2) statements before both the Planning Commission and the City Council from Kevin Coutant, U.S. Cellular's attorney, suggesting the inadequacy of the site.[30] U.S. Cellular offered no evidence to substantiate Mr. Groat's or Mr. Coutant's statements. Thus, substantial evidence supported the City Council's denial based on section 18.13. *Cf. Todd*, 244 F.3d at 63 ("For a

---

[28] The affidavit attached to U.S. Cellular's SP-149 application stated only that "[t]here are no existing towers or permits for towers located *within [one-half] mile* of the [SP-149] site." Sach Affid. ¶ 3 (emphasis added).

[29] With respect to alternative locations, Mr. Groat stated that "[U.S. Cellular had] looked at a number of locations," and then discussed, in *extremely* general terms, U.S. Cellular's technical requirements in locating a site for tower construction.

[30] Before the City Council, Mr. Coutant stated: "[U.S. Cellular] looked at that tower and – and would advise you that that's a 100-foot tower . . . [which] is significantly lower than the 120-feet level that is required for this location and accordingly narrows the coverage . . . [and] diminish[es] the quality of coverage in [the] area that's designed to be covered by this tower." Transcript of June 18, 2001, Broken Arrow City Council Meeting on SP 149, at 9-10.

telecommunications provider to argue that a permit denial is impermissible because there are no alternative sites, it must develop a record demonstrating that it has made a full effort to evaluate the other available alternatives and that the alternatives are not feasible to serve its customers.").

To the extent U.S. Cellular suggests that it was the City's burden to come forward with evidence concerning the feasibility of co-locating on this site, we disagree. The Zoning Ordinance explicitly places this burden on the applicant. Broken Arrow Zoning Ord. art. VIII, § 18.13.

Further, although denials may not be based on "conjecture" or "speculation," *Petersburg Cellular Partnership v. Bd. of Sup'rs of Nottoway County*, 205 F.3d 688, 695 (4th Cir. 2000), "[w]e doubt that Congress intended local zoning boards to pay for experts to prove that there are alternative sites for a proposed tower," *National Tower, LLC v. Plainville Zoning Bd. of Appeals*, 297 F.3d 14, 24 (1st Cir. 2002). Accordingly, we firmly reject the district court's statement that "[t]he opinions expressed by the City officials about the existence of other adequate existing locations amount to nothing more than 'generalized' concerns' which are not adequate to fill the record with substantial evidence." *U.S. Cellular I*, at 12. In *AT&T Wireless PCS, Inc. v. City*

*Council of City of Virginia Beach*, the Fourth Circuit dismissed a similar argument:

> In all cases of this sort, those seeking to build will come armed with exhibits, experts, and evaluations. [The telecommunications provider], by urging us to hold that such a predictable barrage mandates that local governments approve applications, effectively demand that we interpret the Act so as always to thwart average, nonexpert citizens; that is, to thwart democracy. The district court dismissed citizen opposition as 'generalized concerns.' Congress, in refusing to abolish local authority over zoning of personal wireless services, categorically rejected this scornful approach.

155 F.3d 423, 431 (4th Cir. 1998).

Based on the foregoing,[31] we conclude that "substantial evidence contained in [the] written record" supported the City Council's denial of SP-149.[32] 47 U.S.C. § 332(c)(7)(B)(iii).

### 4. *SP-150*

U.S. Cellular advances similar arguments in challenging the City Council's denial of SP-150. At the outset, we note that U.S. Cellular's

---

[31] Because we conclude that SP-149 did not comply with sections 15.5 and 18.13, we need not consider the other two bases advanced by the City Council under sections 18.4 and 18.14 of the Zoning Ordinance.

[32] The district court also concluded that the City Council's denial of SP-149 violated 47 U.S.C. § 332(c)(7)(B)(i)(II), which provides that local governments "shall not prohibit or have the effect of prohibiting the provision of personal wireless services." Insofar as U.S. Cellular did not advance this argument before the district court, the district court erred in considering SP-149 under 47 U.S.C. § 332(c)(7)(B)(i)(II).

contention that the City Council did not apply the standards and criteria set forth in the Zoning Ordinance is wholly without merit. [33]

Similarly, we reject U.S. Cellular's argument that the City Council's denial of SP-150 was not supported by substantial evidence. U.S. Cellular's proposed site, the South Oneta Road property, was zoned AA-1, a transitional-zoning category. Under the Zoning Ordinance, "no new use may be commenced on land, which is assigned transitional zoning . . . without obtaining appropriate conventional zoning." Broken Arrow Zoning Ord. art. VIII, § 15.5. Although the City Council had conditionally approved the South Oneta Road property for conventional zoning on February 21, 2001, U.S. Cellular does not contend that conventional zoning had in fact been "obtain[ed]." [34] *See id.*

Further, the City Council had earmarked the South Oneta Road

---

[33] In accordance with section 18.12, City Council members discussed the following: (1) pursuant to § 18.12(i), "whether . . . there are suitable, existing towers or other supporting structures capable of meeting the technological needs of the applicant," *see*, *e.g.*, Transcript of June 18, 2001, Broken Arrow City Council Meeting on SP-150, at 31, 36-37, 46; (2) pursuant to § 18.12(b) and (c), the "proximity of the tower to residential structures and adjacent residential lot boundaries" and the "nature of uses on adjacent and nearby properties," *see*, *e.g.*, Transcript of June 18, 2001, Broken Arrow City Council Meeting on SP-150, at 36; (3) pursuant to § 18.12(a) and (f), the height and design of the proposed tower, with particular reference to those design characteristics which have the effect of reducing or eliminating visual obtrusiveness, *see*, *e.g.*, Transcript of June 18, 2001, Broken Arrow City Council Meeting on SP-150, at 38, 40, 53-56.

[34] For further discussion on this point, see pages 36-38, *supra*.

property for A-1 zoning. Under section 18.11(G), "towers are normally discouraged in A-1 . . . zoning districts." *Id.*, art. VIII, § 18.11(G). Where an applicant seeks a permit to construct in such disfavored areas, section 18.11 requires that the applicant "establish the elements of the application by clear and convincing evidence." *Id.* Despite section 18.11(G)'s requirement of "clear and convincing" evidence in support of the application, U.S. Cellular ignored the City Council's request that the company provide information on the feasibility of 100-foot, camouflaged tower for the SP-150 site. Thus, substantial evidence supported the City Council's denial under section 18.13, which provides: "No new tower should be permitted by the City Council, unless the applicant demonstrates to the City Council's reasonable satisfaction that no existing tower or other structure can accommodate the applicant's proposed antennae." *Id.*, art. VIII, § 18.13.

### III. Conclusion

Based on the foregoing, we REVERSE the district court's grant of summary judgment in *U.S. Cellular I*, No. 01-CV-0518-E(M), and AFFIRM the district court's grant of summary judgment in *U.S. Cellular II*, No. 01-CV-0550-EA(J).

-42-

*U.S. Cellular v. City of Broken Arrow, Oklahoma*

Nos. 02-5128 and 02-5172

**SHADUR**, District Judge, dissenting:

Some 30 years ago the Mark Harris novel <u>Bang the Drum Slowly</u> was made into a critically acclaimed motion picture of the same name, with the then-little-known Robert DeNiro playing one of the two protagonists and the equally-little-known Michael Moriarty playing the other. Although the film's subject matter was baseball, its larger theme provided keen insights into the human condition.

DeNiro's role was that of unlettered Georgia rustic Bruce Pearson--a rube with the same quality of naivete that was captured by Ring Lardner in such works as <u>Letters from a Busher</u>, <u>You Know Me, Al</u> and <u>Alibi Ike</u>--whose life-threatening affliction with Hodgkins disease was unknown to his teammates, the team manager and the owner. Only star pitcher Henry Wiggin,[1] played by Moriarty, knew of the fatal illness and of Bruce's deteriorating condition--and he used his leverage as the team's key man to force management, without his explaining the reason, to keep Bruce (a

---

[1] One indicium of Bruce's slowness of perception was that all of the other players, knowing that Wiggin was an aspiring writer, referred to him by the nickname "Author." Bruce mistakenly caught that as "Arthur"--so he invariably addressed the Moriarty character by that name.

relief catcher of limited ability) on the team roster.

Bruce, the hapless catcher played by DeNiro, was the target of constant ragging by his teammates because of his unworldliness--including their victimizing him as an invariable loser in their perpetual card game of TEGWAR, no matter what cards he held. When, in response to the effort by the Moriarty character to wise him up, Bruce answered that he had no idea why he lost every time--perhaps he was just a bad card player--the Moriarty-DeNiro exchange went something like this:

"Don't you know what TEGWAR stands for?"

"No."

"It's The Exciting Game Without Any Rules."

What is all of this doing in a dispute between U.S. Cellular and the City of Broken Arrow? This is after all supposed to be an opinion (albeit a dissenting one), not a movie review. But it could not be more relevant, because the City Council in Broken Arrow has outdone TEGWAR with an even more egregious brand of anarchy: It has in fact prescribed a set of rules, but when U.S. Cellular has then conformed meticulously to every one of the prescribed standards, the Broken Arrow response has been "Too bad--you lose anyway." And regrettably the majority opinion has sanctioned that level of lawlessness on the City's part.

It is, I suggest, impossible to read the record as to U.S. Cellular's two

rejected applications for special use permits for the construction of cellular transmission towers without being convinced that the rejection of those applications was foreordained, irrespective of U.S. Cellular's satisfaction of all of the standards established by Broken Arrow's own ordinance dealing with that subject.  But it is not necessary, I believe, to go through such a painstaking (and painful) exercise to demonstrate why the results of our appellate review should be the opposite of those arrived at by the majority:  the affirmance rather than the reversal of one district court's judgment that had rejected the City's denial of application SP-149, and the reversal rather than the affirmance of the other district court's upholding of the denial of application SP-150.  Instead it should suffice, I think, to point to two fatal flaws in each of Broken Arrow's permit denials.

To begin with, it must be remembered that it was the City Council that reached each of the decisions here, not the City's staff people who provided potential input for those decisions both pre-decision (most recently by the Planning Commission) and, more distressingly, post-decision (by the Planning Director).  And here is the entire record of the Council's vote and of its two stated reasons for the turndown in SP-150:

Mr. McCaleb:  I move to deny.

Mr. Petrik:  I'm going to second that for a couple of reasons.
One, there is three existing towers close to it.  There is--and that's

-3-

cell towers; there's a couple of tv antennas that could very well take the--the wind load from--from this; and I think there are better locations for this tower.

Mr. Reynolds: So we have a motion and a second for denial. Any other discussion? No? Okay. We'll call roll.

Mr. Heinrichs: Councilman McCaleb?

Mr. McCaleb: Yes.

Mr. Heinrichs: Councilman Thurman?

Mr. Thurman: Yes.

Mr. Heinrichs: Councilman Carter?

Mr. Carter: Yes.

Mr. Heinrichs: Vice Mayor Petrik?

Mr. Petrik: Yes.

Just as has to be true of any government controlled by law, those who vote on such a governmental action must be viewed as having done so only in the particular terms that they themselves have marked out. So too, the even more terse record of the vote in SP-149 necessarily reflects the actual City Council decision there: an affirmative vote on a motion that was based entirely on two specified grounds:

Motion by Petrik, second by Carter to deny SP 149 as the required setback will inhibit residential growth and there are alternate locations available.

It simply will not do--as was the case here in both instances--for an

-4-

administrative employee, a nondecisionmaker, the City's Planning Director, to inject other reasons post-hoc as to why the City Council might have reached the same conclusions, but that the City Council itself did not articulate in its vote--its decision. Indeed, when any administrative decisionmaker is presented with a host of possible reasons for reaching a decision but then limits its own statement in support of the announced decision to fewer than all of those possibilities, it distorts the decisional process seriously to operate on the premise that the omitted reasons apply as well. As a unanimous United States Supreme Court has taught in FTC v. Indiana Federation of Dentists, 476 U.S. 447, 455 (1986):

> Once the Commission has chosen a particular legal rationale for holding a practice to be unfair, however, familiar principles of administrative law dictate that its decision must stand or fall on that basis, and a reviewing court may not consider other reasons why the practice might be deemed unfair.

Accord, rejecting "post hoc rationalizations for agency action" (in that instance proffered after the fact by appellate counsel rather than, as here, by administrative staffers), Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 50 (1983), a decision cited and quoted with approval by this court in Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1574-75 (10th Cir. 1994).[2]

---

[2] This case's posture differs sharply from the situation in which a reviewing court will uphold a lower court's decision if any line of analysis supports the result reached. In the administrative review context, the decisions exemplified by Indiana Federation and Motor Vehicle Mfrs. prescribe--whether to

(continued...)

Here Congress has decreed that under the Telecommunications Act it is the actual "decision by a State or local government or instrumentality thereof," and not what <u>might</u> have been its decision, that must be "supported by substantial evidence." Although the statute also requires a "written record," that does not permit, as the majority would have it, a retrospective rewrite that does not track--that goes far beyond--the actual decision. In this instance the written record of what the City Council actually decided is embodied in the transcripts of its proceedings and meeting minutes that I have quoted earlier. In those terms the bulk of the majority's extended rationale falls away, and what little remains--what speaks to the two reasons advanced in each of the City Council's actual votes--does not even begin to approach the statutory standard.

There is no occasion, because I do not speak for the court, to itemize here just how unsupported the City Council's own specified reasons for its decisions were in any relevant factual sense. Suffice it to say that the City Council's contemporaneously stated reasons (not the other post-hoc rationalizations) for its two turndown votes simply do not satisfy the "substantial evidence" requirement of the Telecommunications Act, a conclusion that has been amply demonstrated

---

[2](...continued)
guard against arbitrary action by such nonjudicial decisionmakers or otherwise--that the decision under review must comprise both the announced result <u>and</u> the stated reasons for reaching it.

by U.S. Cellular in each instance. And that being so, the reasons that have been found sufficient by the majority--reasons that were advanced by Broken Arrow's Planning Director's letters <u>after</u> the fact to bolster the turndowns--are entirely beside the mark.

There is one other aspect of the two rejections that also bears special mention: the distortion of Broken Arrow's own zoning ordinance to find fault with U.S. Cellular for not having sought and obtained rezoning of the two properties before proceeding with its applications for permission to build the telecommunications towers. Section 15.5 of Broken Arrow's zoning ordinance expressly provides that "no new <u>use</u> may be <u>commenced</u> on land which is assigned transitional zoning without obtaining appropriate conventional zoning" (emphasis added). What that ordinance does <u>not</u> say is that no permit that would allow such use must be obtained <u>before</u> the necessary zoning change is sought.

Here U.S. Cellular specifically agreed, as a condition to its obtaining each special use permit, to pursue all required platting and zoning changes so that no actual use of that permit--no use of the property for a tower--could be commenced until the proper zoning was in place. And that represented an eminently reasonable ordering of events, for it would clearly make no sense for U.S. Cellular to be required to go ahead with the trouble and expense of seeking rezoning until it knew that it could use the properties for the desired purposes.

In sum, Congress has enacted the Telecommunications Act for a dual purpose: to facilitate the growth of wireless telephone service on a national basis, while at the same time preserving local control--subject to specified restrictions--over the siting of towers. What the majority has permitted Broken Arrow to do, I submit, is to subvert the careful balance prescribed by Congress. Accordingly, I respectfully dissent.