**VERIZON WIRELESS (VAW) LLC d/b/a Verizon Wireless and T–Mobile Texas, L.P., Plaintiffs,**

v.

**The CITY OF RIO RANCHO, NEW MEXICO, Defendant.**

No. CV 06–0823 WPL/DJS.

United States District Court, D. New Mexico.

March 8, 2007.

Marc A. Becker, Bradley R. Schneider, Henry Weissmann, Munger Tolles & Olson LL, Los Angeles, CA, Andrew G. Schultz, Rodey, Dickason, Sloan, Akin & Rob, Jeffrey H. Albright, Lewis & Roca Jontz Dawe LL, Albuquerque, NM, Karl J. Nelson, Saul Ewing LL, Baltimore, MD, for Plaintiffs.

Randy S. Bartell, Andrew S. Montgomery, Montgomery & Andrew, Santa Fe, NM, for Defendant.

## ORDER DENYING DEFENDANT'S MOTION TO DISMISS

LYNCH, United States Magistrate Judge.

The City of Rio Rancho enacted an Ordinance that prohibits the construction or modification of wireless telecommunications facilities without a permit issued by the City. Verizon Wireless and T–Mobile Texas (the Companies) currently provide wireless communications services in the City and surrounding areas. They

brought this suit for declaratory and injunctive relief, contending that the Ordinance is preempted by the comprehensive federal regulatory framework governing radio frequency (RF) emissions and by provisions of the Communications Act of 1934, as amended by the Telecommunications Act of 1996(TCA).

The case is before me now on the City's motion to dismiss. The City seeks dismissal on the following three grounds: 1) the Companies have not presented a ripe controversy because they have not applied for a permit; 2) the Companies have not stated a claim upon which relief can be granted because they have sued under the wrong provisions of the TCA; and 3) the Federal Communications Commission (FCC) has primary jurisdiction over one of the Companies' claims. Rejecting all of these assertions, I will deny the motion to dismiss.

## LEGAL AND FACTUAL BACKGROUND

### The TCA

Congress enacted the TCA to promote competition and higher quality in telecommunications services and to encourage the rapid deployment of new telecommunications technologies. *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 115, 125 S.Ct. 1453, 161 L.Ed.2d 316 (2005). Congress intended to promote a national cellular network and to secure lower prices and better service for consumers by opening all telecommunications markets to competition. *Second Generation Props., L.P. v. Town of Pelham*, 313 F.3d 620, 631 (1st Cir.2002). One of the ways in which the TCA accomplishes these goals is by reducing the impediments imposed by local governments upon the installation of wireless communications facilities, such as antenna towers. *Abrams*, 544 U.S. at 115, 125

S.Ct. 1453. The TCA does not, however, abolish all local authority. It tries to balance its goals with the preservation of some local authority over land use. Put simply, the TCA "attempts to reconcile the interests of consumers and residents (many of whom are themselves cell phone users)." *Second Generation*, 313 F.3d at 631.

The TCA generally proscribes local regulations that prohibit or have the effect of prohibiting the ability of any entity to provide a telecommunications service, as well as regulations regarding the entry of a mobile service into a market. 47 U.S.C. §§ 253(a), 332(c)(3). But the TCA preserves local zoning authority regarding the placement, construction, and modification of personal wireless service facilities, subject to several limitations. *Id.* § 332(c)(7). The limitations prohibit local governments from unreasonably discriminating among providers of functionally equivalent services, prohibiting the provision of personal wireless services, and regulating facilities on the basis of the environmental effects of RF emissions to the extent that the facilities comply with the FCC's RF regulations. *Id.* § 332(c)(7)(B)(i), (iv).

### The Ordinance

The stated purpose of the Ordinance is

to ensure that the placement, construction or modification of wireless telecommunications facilities is consistent with the city's land use policies and ... to minimize [the] impact of wireless telecommunications facilities, establish a balanced, fair and efficient process for review and approval of applications, assure an integrated, comprehensive review of environmental impacts of such facilities, and protect the health, safety and welfare of the City of Rio Rancho.

Rio Rancho, N.M., Code of Ordinances § 158.01. As noted above, the Ordinance prohibits the construction or modification of wireless telecommunications facilities without a permit issued by the City. *Id.* § 158.10(A). The term "modification" means:

> The material addition, removal or change of any of the physical and visually discernable components or aspects of a wireless facility, such as antennas, cabling, equipment shelters, landscaping, fencing, utility feeds, changing the color or materials of any visually discernable components, vehicular access, parking and/or an upgrade or change out of equipment for better or more modern equipment. Adding a new wireless carrier or service provider to a telecommunications tower or telecommunications site as a co-location is a modification.

*Id.* "[N]ormal repair and maintenance" and the replacement of one component with a "reasonably similar" component do not constitute modifications. *Id.*

Already existing wireless telecommunications facilities are allowed to continue as nonconforming uses and may be repaired without obtaining a permit. *Id.* § 158.10(B). Additionally, facilities "for providing unlicensed spread spectrum technologies" such as "Wi–Fi and Bluetooth" are exempt from the Ordinance unless the facilities require new towers. *Id.* § 158.11(F).

An application for a permit must include several routine and non-controversial items, such as names and addresses. *Id.* § 158.12(I). It must also state the business and technical justifications for the new facility or modification. *Id.* § 158.12(I)(1)-(2). Additionally, the application must include information regarding RF emissions, transmission power, and frequency, modulation, and class of service. *Id.* § 158.12(I)(15)-(17).

The Ordinance favors "co-location" or shared uses of structures. *See id.* §§ 158.12(K), 158.25, 158.26. An application for a new tower must include a written report demonstrating that "meaningful efforts" were made to secure shared use of an existing tower or the use of alternative structures. *Id.* § 158.12(K)(1). If an existing tower cannot be used, the applicant must attempt to locate the facility in the order of priority set out in the Ordinance. *Id.* § 158.25(A). In keeping with the policy of favoring co-location, a new tower must generally be designed to accommodate at least two additional antenna arrays. *Id.* § 158.12(K)(2).

The Ordinance regulates the visibility, type, and height of towers. *Id.* §§ 158.27, 158.28. It also regulates the types of signs that are allowed or required. Among other required signs, the facility must have a sign advising of the presence of RF radiation. *Id.* § 158.30(A).

An application for a permit must be accompanied by a non-refundable fee of $5,000 for a new tower or $2,500 for a co-location. *Id.* § 158.17. The applicant must also pay the fee of the consultant hired by the City to assist it in evaluating an application. *Id.* § 158.13(A), (B). Indeed, the "official start" of the application process is when the applicant deposits funds into escrow with the City to cover the consultant's initial fees. *Id.* § 158.13(B). The applicant must deposit $8,500 for a new tower and $5,000 for a co-location or material modification of an existing structure. If the funds in escrow fall below $2,500, the applicant must replenish the funds to a minimum of $5,000 before any further action will be taken on the application. The

Ordinance provides for the consultant to invoice the City. *Id.* It does not impose any cap on the consultant's fee. *Id.* § 158.13(B), (C).[1]

The applicant has the burden of proving that a permit should be granted. *Id.* § 158.15(B). If the facility is to be located in a residential zone, the City's Planning and Zoning Board must conduct a public hearing on the application after the City determines that the application is complete. *Id.* § 158.14. The City will review applications "in a timely fashion, consistent with its responsibilities, and shall act within a reasonable period of time given the relative complexity of the application and the circumstances, with due regard for the public's interest and need to be involved, and the applicant's desire for a timely resolution." *Id.* § 158.15(A). The City must act on "completed applications" within thirty calendar days if no public hearing is required. *Id.* There is no deadline for action when a public hearing is required. After considering the application, the City may approve, approve with conditions, or deny a permit. *Id.* § 158.15(B). The decision must be in writing and supported by substantial evidence in a written record. *Id.*

Once a permit is granted, the permit holder and the owner of the site must jointly execute a performance bond or oth-

er form of security in the amount of $25,000 for a tower and $5,000 for a co-location. *Id.* § 158.40. The permit holder must also maintain liability insurance with limitations of $1,000,000 per occurrence and $2,000,000 aggregate. *Id.* § 158.42.

The Ordinance provides that a violation of a permit is punishable by a fine not exceeding $500 per occurrence, with each week's continued violation constituting a separate additional violation. *Id.* § 158.99. The Ordinance does not provide a penalty for constructing or modifying a wireless facility without a required permit. However, the general penalty provision of the City's municipal code provides:

> Any person found guilty of violating any of the provisions of this code shall be fined not more than $500 or imprisoned for a period of not more than 90 days, or by both such fine and imprisonment, and each day this code is violated shall constitute a separate offense, provided, however, that if a specific penalty is provided therefor in any particular and individual section of this code, then the specific penalty shall prevail.

*Id.* § 10.99.

### *The Complaint*

The Companies allege that they own or operate wireless facilities in the City, pro-

---

1. The Companies allege that the Ordinance was drafted by the Center for Municipal Solutions (CMS), a private consulting firm that has drafted similar laws for other governments, including several in New Mexico. (Compl.¶ 18.) According to the Companies, a contract between the City and CMS provides for CMS to draft the Ordinance for free and to serve as the City's consultant for a fee. (*Id.* ¶ 23.) CMS's fee is based on the number of hours devoted to processing a permit application. CMS is also entitled to be reimbursed for its expenses. The contract states that

CMS's hourly fee was $200 at the time the contract was signed, but was subject to change. (*Id.*) The Companies complain that the contract contains no performance criteria for CMS, no caps on its fees, no limits to the number of hours it may bill, and no incentive for the City or CMS to limit costs. (*Id.*) They also claim that the $2,500–to–$5,000 non-refundable application fee far exceeds the regulatory costs typically imposed by local zoning ordinances nationwide, except for other ordinances drafted by CMS. (*Id.* ¶ 21.)

viding mobile voice, data, and other services. (Compl.¶ 44.) They claim that they need to upgrade their networks in the City to provide adequate service to existing and prospective customers. They are currently developing sites in the City to improve service and increase their coverage range. The Companies assert that the Ordinance has interfered with their plans for new sites and for upgrades at existing facilities. (*Id.* ¶¶ 45–50.)

In the first count of their complaint, the Companies assert that the Ordinance violates and is preempted by 47 U.S.C. § 253 because it prohibits or has the effect of prohibiting their ability to provide telecommunications services in the City and surrounding areas and because it is discriminatory. (*Id.* ¶¶ 53, 58.)[2] In the second count, they assert that the Ordinance violates 47 U.S.C. § 332(c)(3) because it regulates the entry of wireless service and encroaches upon the FCC's exclusive authority over the licensing of wireless communications carriers. (*Id.* ¶ 62.) In the third count of the complaint, the Companies assert that the Ordinance is preempted by the FCC's comprehensive regulation of RF emissions and interference. (*Id.* ¶¶ 68–69.)

### RIPENESS

The City makes its ripeness challenge pursuant to Federal Rule of Civil Procedure 12(b)(1). Under this rule, the Companies have the burden of alleging facts to demonstrate that their claims are ripe. *See New Mexicans for Bill Richardson v. Gonzales,* 64 F.3d 1495, 1498–99 (10th Cir. 1995). The City does not challenge the

facts alleged in the complaint and has not supported its motion with any evidence. Therefore, I will accept the allegations in the complaint as true, and I will construe the allegations in the light most favorable to the Companies. *See id.; see also Ruiz v. McDonnell,* 299 F.3d 1173, 1180 (10th Cir.2002). I will also presume that the complaint's general allegations embrace the specific facts that are necessary to support the Companies' claims. *Roe # 2 v. Ogden,* 253 F.3d 1225, 1229 (10th Cir. 2001) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

The ripeness doctrine exists to ensure that courts involve themselves only with concrete disputes and not abstract disagreements. *Skull Valley Band of Goshute Indians v. Nielson,* 376 F.3d 1223, 1237 (10th Cir.2004). Like other justiciability doctrines, it incorporates both constitutional requirements and prudential considerations. *See Nat'l Treasury Employees Union v. United States,* 101 F.3d 1423, 1427 (D.C.Cir.1996). The Tenth Circuit has noted that application of the ripeness doctrine "remains a confused mix of principle and pragmatic judgment reflecting its mixture of [A]rticle III case and controversy requirements with prudential restraints on the exercise of jurisdiction." *Sierra Club v. Yeutter,* 911 F.2d 1405, 1410 (10th Cir.1990). Illustrating this confusion, the City asserts that jurisdiction is lacking under Article III, but the parties' arguments center on prudential concerns. I will evaluate the constitutional and prudential aspects of ripeness separately.

### *Constitutional Requirement*

█ The only constitutional requirement for a ripe claim is "injury in fact."

---

**2.** The Companies claim that on the same day that the City enacted the Ordinance, it approved a license agreement with Azulstar Networks under which Azulstar will provide the City with a wireless communications system that directly competes with services offered by the Companies. (*Id.* ¶¶ 39, 40, Ex. 2.) Azulstar uses spread spectrum facilities, which are exempted from the Ordinance unless they require new towers. (*Id.* ¶ 42.)

*Nat'l Treasury,* 101 F.3d at 1427–28. To determine whether there is an injury in fact, courts apply the same test used to determine whether there is an injury in fact for purposes of establishing standing. *See id.; see also Roe,* 253 F.3d at 1231 (citing *Nat'l Treasury* ). Under this test, the injury must be "concrete and particularized and imminent or actual, as opposed to conjectural or hypothetical." *Roe,* 253 F.3d at 1228–29. The plaintiff must allege concrete plans rather than mere "some day intentions." *Id.* at 1229 (quoting *Lujan,* 504 U.S. at 564, 112 S.Ct. 2130).

The Companies' complaint states that they "presently need to upgrade their networks within the City if they are to provide adequate service to existing and prospective customers." (Compl.¶ 45.) T-Mobile alleges that it "currently has seven new sites designed and under development in new areas of growth as well as two new sites to address capacity needs and areas of weak signal strength within existing coverage areas." (*Id.* ¶ 47.) Verizon alleges that its six facilities in the City are at capacity and that it "will need in the next year to increase microwave transmission capacity at its sites, requiring the deployment of new dish equipment." (*Id.* ¶ 48.) It also plans upgrades that will require installing new antennas. Finally, it "has a new site under development in the City, which will improve service in the area and increase its coverage range." (*Id.*) The Companies assert that the Ordinance has interfered with these plans. (*Id.* ¶¶ 47–48.)

The Companies' plans are sufficiently concrete to satisfy the injury-in-fact test. One court has explained: "In all cases in which the Supreme Court denied standing because the injury was too speculative there was either little indication in the record that the plaintiffs had firm intentions to take action that would trigger the challenged governmental action, or little indication in the record that, even if plaintiffs did take such action, they would be subjected to the challenged governmental action." *Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity,* 950 F.2d 1401, 1407 (9th Cir.1991). Here, the Companies claim that they need to upgrade their networks now and that they have specific sites under development. The City does not dispute that the Ordinance requires the Companies to apply for permits before they can implement their planned upgrades. The Companies contend that they should not have to comply with the Ordinance because it is preempted by the TCA. The conflict between the Companies and the Ordinance is imminent.

### *Prudential Considerations*

Because the Companies have satisfied the constitutional requirement for ripeness, the next task is to determine whether prudential considerations should bar review. There are two prudential considerations: the fitness of the issues for a judicial decision and the hardship to the parties of withholding review. *See Abbott Labs. v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Skull Valley,* 376 F.3d at 1237. The first consideration focuses on whether the issues are legal or factual and whether they hinge on uncertain events that may not happen. *Skull Valley,* 376 F.3d at 1237. Issues may not be fit for a judicial decision if they need further factual development or if they would benefit from a more concrete setting. *Id.* The second consideration focuses on whether the challenged action creates a direct and immediate dilemma for the parties. *Id.* Hardship occurs if the plaintiffs must decide whether to comply with an

allegedly invalid law or to risk substantial penalties for noncompliance. *See Abbott Labs.*, 387 U.S. at 152–53, 87 S.Ct. 1507.

These prudential considerations do not counsel against review of this case. The case primarily involves statutory construction and preemption, which are legal issues. *See Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n,* 461 U.S. 190, 201, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983); *Abbott Labs.,* 387 U.S. at 149, 87 S.Ct. 1507; *Skull Valley,* 376 F.3d at 1238. Because the Companies are mounting a facial attack on the validity of the Ordinance, further factual development of these issues is not necessary. *See Roe,* 253 F.3d at 1232. The case does not hinge on uncertain events that may not happen; as explained above, the Companies allege that they need to upgrade their wireless facilities now. The Ordinance creates a direct and immediate dilemma for the Companies. They must either forego the planned upgrades; comply with an onerous permitting scheme that they contend is preempted by federal law; or attempt the upgrades without obtaining a permit and face the consequences of noncompliance.

Several courts have concluded that similar challenges to local ordinances under the TCA were ripe. In *City of Auburn v. Qwest Corp.,* for example, city ordinances required telecommunications companies to obtain a franchise if they wished to install facilities in public rights-of-way. 260 F.3d 1160, 1170 (9th Cir.2001). Qwest sought a declaratory judgment that the ordinances were preempted by the TCA. *Id.* Qwest was in violation of the ordinances because it owned facilities in the public rights-of-way, but had not applied for a franchise. *Id.* at 1172.

After evaluating the prudential considerations, the court held that the matter was ripe. The court concluded that the controversy was essentially legal in nature because it centered on a preemption analysis and there was no factual dispute about the activity conducted by Qwest or about the applicability of the ordinances to its activities. *Id.* The court also held that Qwest had established hardship because the ordinances imposed multiple obligations, which included paying a $5,000 application fee, filing an application containing detailed information unrelated to the rights-of-way, and other cumbersome requirements. *Id.* at 1173. The court noted, "Were we to decline to hear the case on grounds of ripeness, Qwest would be forced to obtain a franchise and then return to court to argue that ... federal laws preempt the city ordinances—exactly the same argument that it makes here." *Id.*

Because it was in violation of the ordinances, Qwest presented a stronger case for review than the Companies do here. But the Ninth Circuit's observations regarding the prudential considerations are nonetheless relevant to this case, which also involves preemption, a cumbersome application process, and the payment of large fees.

The City argues that the Companies' claims will not be ripe until they apply for a permit under the Ordinance and the City either makes a decision regarding the application or fails to make a timely decision. This argument is unpersuasive because the Companies are bringing a facial challenge to the Ordinance. They challenge the permit requirements themselves, not the application of the requirements. *See TC Sys., Inc. v. Town of Colonie,* 263 F.Supp.2d 471, 479–80 (N.D.N.Y.2003) (rejecting argument that a TCA challenge to an ordinance was not ripe because the plaintiff company had not attempted to

comply with the ordinance); *Cox Commc'ns PCS, L.P. v. City of San Marcos,* 204 F.Supp.2d 1272, 1278–79 (S.D.Cal. 2002) (same); *AT & T Commc'ns of the Southwest v. City of Austin,* 975 F.Supp. 928, 937–38 (W.D.Tex.1997) (same), *vacated as moot,* 235 F.3d 241 (5th Cir.2000).

The City cites several cases to support its assertion that this suit is not ripe. In some of these cases, the plaintiffs did not demonstrate that they would likely engage in any conduct that would be governed by, or come into conflict with, the challenged government action. *See, e.g., Texas v. United States,* 523 U.S. 296, 300, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998); *Morgan v. McCotter,* 365 F.3d 882, 890–91 (10th Cir. 2004); *Qwest Commc'ns Int'l, Inc. v. Fed. Commc'ns Comm'n,* 240 F.3d 886, 893–94 (10th Cir.2001). Here, as explained above, the Companies claim that they need to upgrade their facilities now and that they intend to do so, thus bringing them into imminent conflict with the Ordinance.

In other cases cited by the City, the challenged government actions were not final in the sense that they did not create any legal rights or obligations, nor did they command anyone to do anything or to refrain from doing anything. *See, e.g., Nat'l Park Hospitality Ass'n v. Dep't of the Interior,* 538 U.S. 803, 807–12, 123 S.Ct. 2026, 155 L.Ed.2d 1017 (2003); *Ohio Forestry Ass'n v. Sierra Club,* 523 U.S. 726, 733–34, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998); *Park Lake Res. Ltd. Liability Co. v. U.S. Dep't of Agric.,* 197 F.3d 448, 452–54 (10th Cir.1999). Here, in contrast, the Ordinance obligates and commands anyone who wishes to construct or materially modify a wireless communications facility to obtain a permit or else refrain from the construction or material modification.

One of the City's cases is inapposite because it arose under a different section of the TCA. *See Sprint Spectrum L.P. v. City of Carmel,* 361 F.3d 998 (7th Cir. 2004). In that case, Sprint's permit to erect an antenna was revoked and it was notified that it would have to seek a special use permit. *Id.* at 1000. Sprint sued under 47 U.S.C § 332(c)(7)(B)(v), claiming that the zoning board's decision was not supported by substantial evidence and unreasonably discriminated against Sprint. *Id.* Section 332(c)(7)(B)(v) provides for judicial review of a "final action." The court held that a final action had not yet occurred and the suit was not ripe because Sprint had not sought and been denied a special use permit. *Id.* at 1004. As will be explained more fully below, § 332(c)(7)(B)(v) allows for review of individual decisions regarding the placement, construction, or modification of wireless facilities. Here, the Companies are not challenging such a decision and they are not suing under § 332(c)(7)(B)(v). *See Cox Commc'ns,* 204 F.Supp.2d at 1278 (holding that although a final action is necessary for a suit under § 332(c)(7), it is not required for a suit under § 253).

Concluding that this case is ripe for judicial resolution, I turn now to the City's argument that two counts of the Companies' complaint should be dismissed for failing to state a claim upon which relief can be granted.

#### APPLICABLE PROVISIONS OF THE TCA

█ The City argues that counts one and two of the Companies' complaint fail to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). A Rule 12(b)(6) motion should not be granted unless it appears beyond doubt that the plaintiffs can prove no set of facts in support of the claims that

would entitle them to relief. *GFF Corp. v. Associated Wholesale Grocers, Inc.,* 130 F.3d 1381, 1384 (10th Cir.1997). All well-pleaded factual allegations in the complaint are accepted as true and are viewed in the light most favorable to the plaintiffs. *Id.* Exhibits attached to a complaint are properly treated as part of the pleadings for purposes of ruling on a Rule 12(b)(6) motion. *GF Gaming Corp. v. City of Black Hawk,* 405 F.3d 876, 882 n. 6 (10th Cir. 2005).

Count one of the complaint asserts that the Ordinance violates and is preempted by 47 U.S.C. § 253. Count two asserts that the Ordinance violates and is preempted by 47 U.S.C. § 332(c)(3). The City contends that these counts should be dismissed because 47 U.S.C. § 332(c)(7) operates as the exclusive vehicle for challenging the exercise of local zoning authority regarding wireless facilities. To understand this contention, it is helpful to set out the relevant TCA provisions.

47 U.S.C. § 253 states:

Removal of barriers to entry

(a) In general

No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

47 U.S.C. § 332 states:

Mobile services

.    .    .    .    .

(c) Regulatory treatment of mobile services

.    .    .    .    .

(3) State preemption

(A) [N]o State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service, except that this paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile services . . . .

(7) Preservation of local zoning authority

(A) General authority

Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.

(B) Limitations

(i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof—

(I) shall not unreasonably discriminate among providers of functionally equivalent services; and

(II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

(ii) A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request.

(iii) Any decision by a State or local government or instrumentality thereof

to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

(iv) No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.

(v) Any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction. The court shall hear and decide such action on an expedited basis. Any person adversely affected by an act or failure to act by a State or local government or any instrumentality thereof that is inconsistent with clause (iv) may petition the Commission for relief.

The City's argument is straightforward and rests on § 332(c)(7)(A), which states, "Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a ... local government ... over decisions regarding the placement, construction, and modification of personal wireless service facilities." Since the Ordinance relates to the placement, construction, and modification of personal wireless service facilities, the City believes that it falls within the ambit of § 332(c)(7)(A). The City points out that § 253 and § 332(c)(3) are in the same

chapter as § 332(c)(7), but are not in the same paragraph. Because § 332(c)(7)(A) states that the authority of local governments over the placement, construction, or modification of personal wireless facilities can only be limited as provided in § 332(c)(7), the City argues that § 253 and § 332(c)(3) have no effect on the Ordinance. Thus, according to the City, the Companies cannot challenge the Ordinance on the basis that it violates those sections, and may only challenge it on the basis that it violates § 332(c)(7).

The Companies' response zeroes in on the word "decisions." They argue that an ordinance is not a decision. Since § 332(c)(7)(A) only exempts decisions from the other requirements of the TCA, they assert that the Ordinance must comply with § 253 and § 332(c)(3). In reply, the City asserts that the word "decisions" can encompass ordinances.

In construing statutes, courts strive to determine congressional intent by using traditional tools of statutory interpretation. *United States ex rel. Sikkenga v. Regence Bluecross Blueshield,* 472 F.3d 702, 710 (10th Cir.2006). The starting point is always the language of the statute itself. If that language is clear and unambiguous, the plain meaning of the statute controls. *Id.* To determine the plain meaning of statutory words, courts often consult dictionaries. *See United States v. Montgomery,* 468 F.3d 715, 719 & n. 3 (10th Cir.2006); *Walker Stone Co. v. Sec'y of Labor,* 156 F.3d 1076, 1081 (10th Cir. 1998). When legal terms are used in a statute, they are generally presumed to have been used in their legal sense. 2A NORMAN J. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 47:30 (6th ed.2006). The plainness or ambiguity of a statute is also determined by the specific context in

which the language is used and the broader context of the statute as a whole. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). "[T]he meaning of statutory language, plain or not, depends on context." *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991). Finally, courts should favor reasonable interpretations over unreasonable ones. *See Robbins v. Chronister*, 435 F.3d 1238, 1241 (10th Cir.2006) ("When statutory language reasonably admits of alternative constructions, there is nothing remarkable about resolving the textual ambiguity against the alternative meaning that produces a result the framers are highly unlikely to have intended.").

It is true that an ordinance constitutes a decision in some sense of the word. One dictionary defines "decision" as "a determination arrived at after consideration." MERRIAM-WEBSTER ONLINE DICTIONARY, at http://www.m-w.com/dictionary/decision. Under this broad definition, an ordinance would be a decision. But the common legal understanding of "decision" is narrower than that. *Black's Law Dictionary* defines the word as "[a] judicial or agency determination after consideration of the facts and the law; [especially], a ruling, order, or judgment pronounced by a court when considering or disposing of a case." BLACK'S LAW DICTIONARY 436 (8th ed.2004). In other words, a decision is case-specific; it is the result of an adjudicative process, not a legislative process.

From reading § 332(c)(7), it is obvious that Congress intended the word "decisions" to refer to some sort of formal legal determination. Neither party argues otherwise. Therefore, the legal definition of the word should control.

Interpreting § 332(c)(7) to refer to individual zoning decisions makes sense in the context of other sections of the TCA. Sections 253 and 332(c)(3) proscribe ordinances that have the effect of prohibiting the ability to provide telecommunications services or that regulate the entry of mobile services. Section 332(c)(7) provides similar proscriptions on individual zoning decisions. The statutes thus provide parallel proscriptions for ordinances and individual zoning decisions.

Support for this result is also found in subsections (B)(ii), (B)(iii), and (B)(v) of § 332(c)(7). Subsections (B)(ii) and (B)(iii) refer to individual requests for permission to place, construct, or modify personal wireless service facilities, thus indicating that the word "decisions" was used in the case-specific sense. Subsection (B)(v) sets forth a thirty-day statute of limitations for filing a suit to challenge "any final action or failure to act by a ... local government ... that is inconsistent with this subparagraph." *See Abrams*, 544 U.S. at 122, 124–25, 125 S.Ct. 1453 (treating this subsection as a statute of limitations); *Vertical Broad., Inc. v. Town of Southampton*, 84 F.Supp.2d 379, 387 (E.D.N.Y.2000) (same). Applying this limitations period to a facial challenge to an ordinance is problematic. Presumably, it would require any suit to be brought within thirty days after the ordinance's enactment.

Whereas subsections (B)(ii), (B)(iii), and (B)(v) support interpreting the word "decisions" to mean individual zoning decisions, subsections (B)(i) and (B)(iv) do not fit so neatly with that interpretation. Subsection (B)(i) provides that the "regulation" of the placement, construction, and modification of personal wireless service facilities shall not unreasonably discriminate or have the effect of prohibiting the provision of personal wireless services. Subsection (B)(iv) provides that local governments

cannot "regulate" the placement, construction, and modification of personal wireless service facilities because of the environmental effects of RF emissions if the facilities comply with FCC regulations. The words "regulation" and "regulate" generally refer to the "act or process of controlling by rule...." BLACK'S LAW DICTIONARY, *supra*, at 1311. The City argues that the use of these words indicates that the word "decisions" in subsection (A) encompasses ordinances. The City also argues that the title of § 332(c)(7)—"Preservation of local zoning authority"—implies the same thing. *See id.* at 1649 (defining "zoning" as "[t]he legislative division of a region, [especially] a municipality, into separate districts with different regulations within the districts for land use....").

Although the use of these terms complicates the analysis, the most reasonable interpretation of the word "decisions" is that it refers only to individual zoning decisions. The only two reported cases that have squarely addressed the question reached this conclusion. *See Sprint Telephony PCS, L.P. v. County of San Diego*, 377 F.Supp.2d 886 (S.D.Cal.2005); *Cox Commc'ns*, 204 F.Supp.2d at 1277–78.

In *Cox Communications*, the court noted that "any interpretation of §§ 332(c)(7)(B)(i)(I) and 332(c)(7)(B)(i)(II) that allows applicants to challenge the laws, rather than decisions, would be superfluous because 47 U.S.C. § 253 already gives applicants this option. Whereas 47 U.S.C. § 253 provides a cause of action against *local regulations*, section 332 gives a cause of actions against *local decisions*." 204 F.Supp.2d at 1277.

In *Sprint Telephony*, the court rejected a county's argument that the use of the words "regulation" and "regulate" indicates that § 332(c)(7) applies to ordi-

nances. The court stated that the statute's primary focus is on individual decisions. 377 F.Supp.2d at 891. The court further reasoned, "The provisions of section 332(c)(7)(B) are *limitations* on the general authority set forth in section 332(c)(7)(A), which concerns *decisions....*" *Id.* at 891–92. The court also emphasized the short limitations period in § 332(c)(7)(v), noting that if the limitations period governed facial challenges to ordinances, "[a]ny party who failed to bring suit within the 30 days, even if the party lacked standing at that time, would be barred from raising a facial challenge. Congress could not have intended such a result." *Id.* at 892.

The City claims that several courts have held that § 332(c)(7) encompasses the authority of local governments to enact ordinances as well as to make individualized decisions. Most of the cases cited by the City do not go as far as the City would like. None of the cases addresses the issue that has arisen in this case, namely, whether an ordinance regulating the placement, construction, and modification of personal wireless service facilities may be challenged under § 253 and § 332(c)(3). *See Abrams*, 544 U.S. at 115, 125 S.Ct. 1453; *Sprint PCS Assets, L.L.C. v. City of La Cañada Flintridge*, 448 F.3d 1067 (9th Cir.2006); *U.S. Cellular Tel. of Greater Tulsa v. City of Broken Arrow*, 340 F.3d 1122 (10th Cir.2003); *Second Generation*, 313 F.3d at 630–32; *APT Pittsburgh Ltd. P'ship v. Penn Township Butler County*, 196 F.3d 469 (3rd Cir.1999); *AT & T Wireless PCS, Inc. v. City Council of Virginia Beach*, 155 F.3d 423 (4th Cir.1998); *Vertical Broad.*, 84 F.Supp.2d at 387–88.

The City's reliance on *Abrams* is misplaced. That case arose from a city's wrongful denial of a conditional-use per-

mit. The only issue before the Supreme Court was whether § 1983 provided a remedy for the applicant or whether he was limited to the remedy provided by § .332(c)(7)(v). *Abrams,* 544 U.S. at 117–21, 125 S.Ct. 1453. In addressing this issue, the Court summarized § 332(c)(7) by stating that it "imposes specific limitations on the traditional authority of state and local governments to regulate the location, construction, and modification of such facilities...." *Id.* at 115, 125 S.Ct. 1453. The City seizes on the Court's use of the word "regulate," suggesting that by using this word the Court construed § 332(c)(7) to encompass ordinances. But that issue simply was not before the Court, and there is nothing in the opinion to indicate that the Court was focused on the distinction between ordinances and individualized decision-making. The Court most likely used the word "regulate" because that word and "regulation" are used in the statute itself. The City also quotes Justice Stevens' comment that "Congress intended § 332(c)(7) to operate as the . exclusive remedy by which plaintiffs can obtain judicial relief for violations of the TCA." *Id.* at 130 n. *, 125 S.Ct. 1453 (Stevens, J., concurring). Taking this comment out of the context in which the case arose, the City suggests that it supports the City's position that no relief can be granted under § 253 or § 332(c)(3). It is obvious from the procedural posture of *Abrams* that this comment only means that § 1983 does not provide a remedy.

The City similarly seizes on the Tenth Circuit's use of the word "regulate" in *U.S. Cellular Telephone of Greater Tulsa v. City of Broken Arrow,* 340 F.3d at 1132. As in *Abrams,* the court was dealing with the denial of a permit, and there is nothing in the opinion to indicate that the court used the word "regulate" to mean that § 332(c)(7) encompasses ordinances.

The City suggests that *Vertical Broadcasting* stands for the proposition that § 332(c)(7) is the exclusive vehicle for challenging the exercise of local zoning authority regarding wireless facilities because the court there stated, "To the extent that plaintiffs have any claim at all, it is a claim under Section 332—not Section 253." 84 F.Supp.2d at 388. This case is inapposite. In *Vertical Broadcasting,* a company brought suit under § 253 to challenge a town's denial of its request to erect a tower. Because the company was challenging the denial of its request, not an ordinance, the suit should have been brought under § 332(c)(7). But any relief under § 332(c)(7) would have been time-barred because the suit was brought more than thirty days after the denial. The court rejected the company's attempt to circumvent the statute of limitations by relying on § 253. *Id.* at 387–88.

In several of the cases cited by the City, the plaintiff brought suit under § 332(c)(7), challenging not only an adverse decision on a request for a permit or variance, but also the ordinance upon which the decision was based. *See Sprint PCS Assets,* 448 F.3d at 1071–72; *Second Generation,* 313 F.3d at 625–26, 630; *APT Pittsburgh,* 196 F.3d at 473–75. Because the courts considered the challenges to the ordinances, they must have implicitly assumed that the requirements of § 332(c)(7) apply to ordinances and thus that an ordinance is a decision within the meaning of that statute. But the courts did not expressly address this issue, nor did they address the applicability of § 253 or § 332(c)(3) to ordinances. These cases are consistent with *Sprint Telephony,* in which the court stated, "It is possible that a court reviewing an individual decision under section 332 could also properly reach the issue of whether the regulation or ordinance underlying the

decision is valid. However, nothing in section 332 precludes facial challenges of wireless regulations under section 253(a)." *Sprint Telephony*, 377 F.Supp.2d at 892 (citation omitted).

The final case cited by the City is *AT & T Wireless PCS, Inc. v. City Council of Virginia Beach*. In that case, a city denied the plaintiffs' application for a conditional use permit to erect two communications towers. *AT & T Wireless PCS*, 155 F.3d at 424. The plaintiffs argued that the denial had "the effect of prohibiting the provision of personal wireless services" under § 332(c)(7)(B)(i)(II). The court rejected that argument because "any reading of subsection (B)(i)(II) that allows the subsection to apply to individual decisions would effectively nullify local authority by mandating approval of all (or nearly all) applications, a result contrary to the explicit language of section (B)(iii), which manifestly contemplates the ability of local authorities to 'deny a request.'" *Id.* at 428. To reconcile subsections (B)(i)(II) and (B)(iii), the court held that the word "regulation" in § 332(c)(7)(B)(i)(II) only applies to "blanket prohibitions" or "general bans or policies" and not to individual zoning decisions. *Id.* at 428–29. The court stated in dicta, however, that the word "regulation" in § 332(c)(7)(B)(i)(I) could refer to both general policies and individual zoning decisions. *Id.* at 429. The court was not troubled by the fact that its interpretation accorded different meanings to the same word. *Id.*

Unlike the Fourth Circuit, I find it strange to think that Congress intended for the word "regulation" to have different meanings in subsections (B)(i)(I) and (B)(i)(II). *See Brown v. Gardner*, 513 U.S. 115, 118, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994) (noting that the "presumption that a given term is used to mean the same thing throughout a statute [is] at its most vigorous when a term is repeated within a given sentence"). The court believed it had to accord different meanings to the word to reconcile subsections (B)(i)(II) and (B)(iii). Other courts, however, have not perceived any conflict between these subsections and have not found it necessary to limit subsection (B)(i)(II) to blanket prohibitions or general bans. *See, e.g., MetroPCS, Inc. v. City and County of San Francisco*, 400 F.3d 715, 730–31 (9th Cir.2005) (rejecting *AT&T Wireless PCS* and citing cases).

Both the City and the Companies assert that the legislative history supports their interpretation of § 332(c)(7). But the legislative history cited by the parties only paraphrases the language of the statute and adds no insight as to whether Congress intended the word "decisions" to encompass ordinances. (*See, e.g.,* Def.'s Mem. Supp. Mot. Dismiss (Doc. 10) at 18–19 (citing legislative history)). Therefore, it is not helpful to my analysis. *See Miller v. Comm'r*, 836 F.2d 1274, 1282 (10th Cir. 1988) (declining to rely on legislative history because it was "scant and capable of differing interpretations").

In conclusion, I reject the City's argument that § 332(c)(7) is the exclusive vehicle through which the Companies may challenge the Ordinance. The Companies may bring a facial challenge to the Ordinance under § 253 and § 332(c)(3). Contrary to the City's suggestion in its reply memorandum (Doc. 15 at 11–12), this does not mean that the City lacks the authority to enact ordinances related to personal wireless service facilities. It means only that such ordinances must be evaluated against these statutes.

PRIMARY JURISDICTION

■ The City contends that count three of the Companies' complaint should be re-

ferred to the FCC pursuant to the primary jurisdiction doctrine. "Primary jurisdiction is a prudential doctrine designed to allocate authority between courts and administrative agencies. An issue of primary jurisdiction arises when a litigant asks a court to resolve '[an] issue [ ] which, under a regulatory scheme, ha[s] been placed within the special competence of an administrative body.'" *S. Utah Wilderness Alliance v. Bureau of Land Mgmt.*, 425 F.3d 735, 750 (10th Cir.2005) (quoting *United States v. W. Pac. R.R.*, 352 U.S. 59, 64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956)).

Although there is no mechanical formula for applying the doctrine of primary jurisdiction, the analysis focuses on the two purposes served by the doctrine. *Id.* at 751. Those purposes are: 1) to promote regulatory uniformity by preventing courts from interfering sporadically with a comprehensive regulatory scheme, and 2) to promote resort to agency expertise by allowing courts to consult agencies on issues of fact not within the conventional experience of judges. *Id.* The primary jurisdiction doctrine "does not require that all claims within an agency's purview be decided by the agency. Nor is it intended to 'secure expert advice' for the courts from regulatory agencies every time a court is presented with an issue conceivably within the agency's ambit." *Brown v. MCI WorldCom Network Servs.*, 277 F.3d 1166, 1172 (9th Cir.2002).

Count three of the complaint asserts that the Ordinance is preempted by the FCC's comprehensive regulation of RF interference and the environmental effects of RF. (Compl.¶¶ 68–69.) The complaint additionally points out that § 332(c)(7)(B)(iv) "expressly preempts ... local governments from making individual siting decisions on the basis of the environmental effects of RF emissions, to the extent that such facilities comply with FCC regulations." (*Id.* ¶ 68.)

The City argues that the adjudication of count three will require a determination as to whether the Companies' facilities comply with FCC regulations under § 332(c)(7)(B)(iv). The City maintains that making this determination will require technical expertise that the FCC has and courts lack. The City also suggests that the FCC has primary jurisdiction over count three because § 332(c)(7)(B)(v) provides, "Any person adversely affected by an act or failure to act by a State or local government or any instrumentality thereof that is inconsistent with clause (iv) may petition the [FCC] for relief."

The City's argument rests on the false idea that count three raises a claim under § 332(c)(7)(B)(iv). To the contrary, the Companies are not challenging a wireless facility siting decision that was based on the environmental effects of RF emissions; they are making a facial preemption challenge to the Ordinance predicated on the comprehensive federal regulation of RF emissions and interference. Section 332(c)(7)(B)(iv) is but one example of this regulation, according to the Companies.

The question of whether a local law is preempted by federal law is within the expertise of courts, not agencies. *See Ass'n of Int'l Auto. Mfrs. v. Comm'r, Mass. Dep't of Envtl. Prot.*, 208 F.3d 1, 5 (1st Cir.2000); *Nat'l Tank Truck Carriers v. Burke*, 608 F.2d 819, 821–23 (1st Cir. 1979). More particularly, courts in the Northern and Western Districts of Texas have refused to apply the primary jurisdiction doctrine to the question of whether a local law is preempted by the TCA. *See AT&T Commc'ns of the Southwest v. City of Dallas*, 8 F.Supp.2d 582, 590 (N.D.Tex.

1998); *AT&T Commc'ns of the Southwest v. City of Austin,* 975 F.Supp. at 938–39; *see also Sw. Bell Wireless v. Johnson County Bd. of County Comm'rs,* 199 F.3d 1185, 1189–93 (10th Cir.1999) (holding, without considering primary jurisdiction, that county zoning regulation regarding RF interference was preempted).

The considerations underlying the primary jurisdiction doctrine do not apply to the preemption issues raised here. Accordingly, I decline to refer count three to the FCC.

### CONCLUSION

For the reasons stated above, the City's motion to dismiss is denied.

IT IS SO ORDERED.